UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TYRONE DAVENPORT** | **CIVIL ACTION** |
| **VERSUS** | **NO.    22-1277** |
| **TIM HOOPER, WARDEN** | **SECTION: "I"(5)** |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Tyrone Davenport, is a convicted inmate currently incarcerated at the Louisiana State Prison in Angola, Louisiana.    On August 14, 2013, Davenport and seven others were charged by bill of indictment in Orleans Parish with various criminal offenses committed while members of the "Taliban" gang.[1]    On June 19, 2015, after a joint trial, both Davenport and co-defendant Dale Elmore were found guilty of racketeering in violation of La. Rev. Stat. § 15:1353, second-degree murder of Ralph Bias in violation of La. Rev. Stat. §

---

[1]  State Rec., Vol. 1 of 22, Bill of Indictment, 8/19/13.    Dale "Check Peazy" Elmore, Jamal "Mal" Harris, Seyuntray "Brotha" Noel, Jerome "Sookie" Toliver, Cornie "Porch" Jones, Darryl "Lil Darryl" Bannister, and Tyrone "Goggles" Brooks were also named in the indictment.

14:30.1 and La. Rev. Stat. § 15:1403(B), and attempted second-degree murder of Corey Martin in violation of La. Rev. Stat. §§ 14:(27)30.1 and 15:1403(B).[2]    On October 21, 2015, Davenport was sentenced to 50 years at hard labor without the benefit of parole, probation or suspension of sentence for racketeering, and life at hard labor without the benefit of parole, probation or suspension of sentence for second-degree murder with an additional 50 years for the gang enhancement provision to be served consecutively to the sentences for racketeering and second-degree murder.[3]    Davenport was also sentenced to 50 years at hard labor without the benefit of parole, probation or suspension of sentence for attempted second-degree murder with an additional 25 years without benefits for the gang enhancement provision to be served consecutively to the sentences for racketeering and second-degree murder. [4]    The state district court denied Davenport's motion for reconsideration of sentence.[5]

On direct appeal, Davenport's appointed counsel asserted the following claims: (1) insufficient evidence supported the convictions; (2) the trial court gave erroneous jury instructions regarding attempted second-degree murder; (3) the trial court permitted a climate of fear at trial which resulted in an inflammatory and prejudicial atmosphere that negatively impacted the verdict and ultimately violated his due process rights to a fair trial;

---

[2]  State Rec., Vol. 2 of 22. Trial Minute Entry, 6/16/15; Trial Minute Entry, 6/17/15; State Rec., Vol. 3 of 22, Trial Minute Entry, 6/18/15; Trial Minute Entry, 6/19/15; State Rec., Vol. 12 of 22, Trial Transcript, 6/16/157; Trial Transcript, 6/17/15; State Rec., Vol. 13 of 22, Trial Transcript, 6/18/15; State Rec., Vol. 14 of 22, Trial Transcript, 6/19/15; Voir Dire Transcript, 6/16/15; Rec. Doc. 27 (Trial Transcript, 6/19/15).    The six other co-defendants pled guilty to various offenses.

[3]  State Rec., Vol. 2 of 22 Minute Entry, 10/21/15.

[4]  State Rec., Vol. 2 of 22 Minute Entry, 10/21/15.

[5]  State Rec., Vol. 2 of 22, Minute Entry, 10/21/15; State Rec., Vol. 6 of 23, Motion to Reconsider Sentence, 10/21/15.

(4) the prosecution's closing was improper.[6]    Davenport filed a *pro se* brief in which he argued that the trial court exceeded its jurisdiction in proceeding to trial on the charges against him because the record did not reflect that the indictment was returned in open court as required by La. Code Crim. P. art. 383.[7]    On October 18, 2017, the Louisiana Fourth Circuit affirmed Davenport's conviction and amended his sentences on the racketeering and gang enhancement provision convictions to delete the prohibition of parole.[8]

On March 9, 2018, the Louisiana Supreme Court denied as untimely Davenport's *pro se* related writ application.[9]    The Louisiana Supreme Court denied Davenport's motion for reconsideration on May 25, 2018.[10]    On October 8, 2018, the Louisiana Supreme Court denied Davenport's counseled related writ application without reasons.[11]

On January 3, 2020, Davenport filed a *pro se* application for post-conviction relief with the trial court.[12]    In that application, he asserted that: (1) his trial counsel was ineffective in failing to investigate and interview witnesses; (2) his trial counsel was ineffective for

---

[6]  State Rec., Vol. 14 of 22, Appeal Brief, 2016-KA-0223, 8/11/16.

[7]  State Rec., Vol. 14 of 22, *Pro Se* Brief, 2016-KA-0223, 3/28/17.

[8]  *State v. Davenport*, 2016-KA-0223 (La. App. 4 Cir. 10/18/17), 316 So. 3d 888; State Rec., Vol. 8 of 22.

[9]  *State v. Davenport*, 2018-KH-0079 (La. 3/9/89), 237 So. 3d 1191; State Rec., Vol. 18 of 22.

[10]  *State v. Davenport,* 2018-KH-0079 (La. 5/25/18), 242 So. 3d 1230; State Rec., Vol. 18 of 22.

[11]  *State v. Davenport,* 2017-K-1947 (La. 10/8/18), 253 So. 3d 797; State Rec., Vol. 16 of 22.

[12] Rec. Doc. 7-4, Uniform Application for Post-Conviction Relief and Memorandum in Support of Application for Post-Conviction Relief.    Contrary to the State's claim, a copy of Davenport's application for post-conviction relief is not included in the state court record, rather there are two copies of co-defendant Elmore's application.    Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system."    *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006).    Davenport, however, did not date his application or his supporting memorandum.    His pleadings were received by the state district court on January 3, 2020.

failing to preserve his rights under *Bruton v. United States*, 391 U.S. 123 (1968), and *Douglas v. Alabama*, 380 U.S. 415 (1965); (3) his counsel was ineffective in allowing hearsay testimony in the form of 911 recorded calls in violation of *Davis v. Washington*, 547 U.S. 813 (2006), and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011); (4) his trial counsel was ineffective in failing to request a mandatory mistrial under La. Code Crim. P. art. 770 after the trial court ruled that the prosecution could introduce inadmissible evidence, and his appellate counsel was ineffective in failing to raise the issue on appeal; (5) his rights under the Fourteenth Amendment were violated when the authorities destroyed material evidence.[13]

Davenport filed a counseled supplemental memorandum claiming: (1) his trial counsel was ineffective in failing to bring the counternarrative to the jury's attention that witnesses claimed that the shooters fired from and fled in a Bronco; (2) the State destroyed evidence; (3) trial counsel was ineffective in failing to request a limiting instruction and move for a mistrial when the trial court allowed the introduction of a co-defendant's statements into evidence; (4) trial counsel was ineffective in failing to protect against the prosecution's racist troupes and inflammatory antics.[14]    On August 3, 2020, the State filed a procedural objection pursuant to La. Code Crim. P. art. 930.4 to Davenport's claim relating

---

[13]  Rec. Doc. 7-4, at p. 8.    Co-defendant Elmore filed his application for post-conviction relief on December 20, 2017, raising similar claims to those raised by Davenport.    State Rec., Vol. 7 of 22, First Uniform Application for Post-Conviction Relief, 12/20/17.    On March 9, 2020, the State filed procedural objections under La. Code Crim. P. Art. 930.4 and 930.8 claiming that Elmore's claim relating to the destruction of photographic evidence could have been brought prior to or during direct appeal.    State Rec., Vol. 7 of 22, State's Procedural Objections to Defendant's Original *Pro Se* Application for Post-Conviction Relief, 3/9/20.    On March 11, 2020, the state district court sustained the State's procedural objections to the destruction of evidence claim and ordered it to respond to the merits of the other claims.    State Rec., Vol. 7 of 22, Judgment, 3/11/20.

[14]  State Rec., Vol. 8 of 22, Supplemental Memorandum in Support of Petitioner's Application for Post-Conviction Relief, 6/2/20.

to the destruction of evidence.[15]    Davenport filed a traverse.[16]    The State filed a reply.[17]

The state district court held a hearing on September 10, 2020.[18]    The state district court overruled the State's procedural objections to Davenport's destruction-of-evidence claim and ordered the State to file a response on the merits of Davenport's application.[19]

The State filed a writ application with the Louisiana Fourth Circuit Court of Appeal.[20] On November 17, 2020, the Louisiana Fourth Circuit denied the writ application.[21]    The Louisiana Supreme Court denied the State's related writ application on March 9, 2021.[22]

The State responded to Davenport's destruction-of-evidence claim on June 15, 2021.[23] On July 20, 2021, the state district court declined to summarily deny that claim and ordered the State to respond to Davenport's other claims.[24]    The State filed its response as to the

---

[15]  State Rec., Vol. 7 of 22, State's Procedural Objections to Defendant's Original and *Pro Se* Application for Post-Conviction Relief, 7/31/20.

[16]  State Rec., Vol. 7 of 22, Traverse to the State's Procedural Objections to Petitioner's Counselled and *Pro Se* Application for Post-Conviction Relief, 8/4/20.

[17]  State Rec., Vol. 7 of 22, State's Reply to Traverse of State's Procedural Objections to Defendant's Original and Amended *Pro Se* Application for Post-Conviction Relief, 8/13/20.

[18]  State Rec., Vol. 15 of 22, Hearing Transcript, 9/10/20.

[19]  State Rec., Vol. 15 of 22, Judgment, 9/3/20.    In that same judgment, the state district court vacated its March 11, 2020 judgment as it related to Elmore's claim of destruction of evidence, and ordered the State to file a response to that claim.    *Id.*

[20]  State Rec., Vol. 15 of 22, State Writ Application, 2020-K-0517, undated.

[21]  *State v. Davenport*, 2020-K-0517 (La. App. 4 Cir. 11/17/20); State Rec., Vol. 15 of 22.

[22]  *State v. Davenport*, 2020-KP-01437 (La. 3/9/21), 312 So.3d 584; State Rec., Vol. 19 of 22.

[23]  Rec. Doc. 7-12.

[24]  State Rec., Vol.2 of 22, Docket Master Entry, 7/20/21.    While Davenport claims that the state district court granted an evidentiary hearing on his destruction-of-evidence claim, *see* Rec. Doc. 7–2, at p. 3, the docket master entry merely reflects that a ruling was set for September 23, 2021.    State Rec., Vol. 2 of 22, Docket Master Entry, 7/20/21.

other claims on September 21, 2021.[25]    Davenport filed a reply memorandum on October 5, 2021.[26]    The state district court denied Davenport's post-conviction claims on October 12, 2021.[27]

The Louisiana Fourth Circuit denied Davenport's counseled related writ application on February 14, 2022. [28]    On April 26, 2022, the Louisiana Supreme Court denied Davenport's related writ applications finding he failed to show ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984), and he failed to show that the State withheld material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[29]

The Louisiana Fourth Circuit denied Davenport's supplemental writ application on February 25, 2022.[30]    The Louisiana Supreme Court denied his related writ application without reasons on April 26, 2022.[31]

In the interim, Davenport filed two *pro se* motions alleging that the jury verdict

---

[25]    State Rec., Vol. 7 of 22, State's Response to Merits of Post-Conviction Relief Application, 9/21/21.

[26]    Rec. Doc. 7-14.

[27]    State Rec, Vol. 2 of 22, Minute Entry, 10/12/21.    By order dated January 5, 2022, the Louisiana Fourth Circuit directed the state district court to issue its "Reasons for Judgment," or, alternatively, a *per curiam.    See State v. Davenport*, 2021-K-747 (La. App. 4 Cir. 2/14/22); State Rec., Vol. 20 of 22. On January 13, 2022, the state district court issued its "*Per Curiam*" as to co-defendant Elmore.    State Rec., Vol. 20 of 22, *Per Curiam*, 1/13/22.    It does not appear that the state district court issued a similar written ruling as to Davenport.

[28]    *State v. Davenport*, 2021-K-747 (La. App. 4 Cir. 2/14/22); State Rec., Vol. 20 of 22.    The Louisiana Fourth Circuit consolidated for purposes of review and consideration the writ applications of Davenport and Elmore.

[29]    *State v. Elmore*, 2022-KP-00423 (La. 4/26/22), 336 So. 3d 886; State Rec., Vol. 20 of 22; *State v. Davenport*, 2022-KP-00423 (La. 4/26/22), 336 So. 3d 889; State Rec., Vol. 21 of 22.

[30]    *State v. Davenport*, 2022-K-0115, 2/25/22; State Rec., Vol. 22 of 22.

[31]    *State v. Davenport*, 2022-KH-00451, 4/26/22; State Rec., Vol. 22 of 22.

violated *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020).[32]    On March 10, 2022, the state district court denied the motions, finding that they were untimely under La. Code Crim. P. art. 930.8.[33]    The Louisiana Fourth Circuit denied Davenport's related writ application on May 17, 2022.[34]

On April 25, 2022, Davenport filed a *pro se* application for habeas corpus relief.[35]    In that application, Davenport claims: (1) ineffective assistance of counsel for failing to locate and subpoena two eyewitnesses who witnessed the shootings; (2) ineffective assistance of counsel for failing to preserve his rights at trial under *Bruton*; (3) ineffective assistance of counsel in allowing 911 calls to be played at trial without objection or cross-examination; (4) ineffective assistance of trial counsel for failing to request a mistrial after the trial court allowed inadmissible evidence and ineffective assistance of appellate counsel for failure to raise the issue on appeal.

On May 20, 2022, the Court received Davenport's supplemental application for habeas corpus.[36]    On June 21, 2022, the Court granted Davenport's counsel leave to

---

[32]  State Rec., Vol. 8 of 22, Untitled Motion, 2/18/22; Motion to Show and Prove A Structural Error under *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, and *Scott*, 309 Or. App. 615, 3/9/22..

[33]  State Rec., Vol. 8 of 22, Judgment, 3/10/22.

[34]  *State v. Davenport*, 2022-K-0323, 5/17/22; State Rec., Vol. 22 of 22.

[35]  Rec. Doc. 4, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody. The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting *pro se*.    Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes.    *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).    The clerk of this Court received Davenport's original petition on May 9, 2022, and it was eventually filed on May 13, 2022, after Davenport paid the filing fee.    Davenport dated his signature of the original pleadings on April 25, 2022, *see* Rec. Doc. 4-1, at p. 10, which is the earliest date appearing in the record on which he could have presented the pleadings to prison officials for mailing to a federal court.

[36]  Rec. Doc. 7, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody

supplement the *pro se* petition with a supplemental memorandum that addressed the claims in Davenport's *pro se* application in more detail and included a claim that the State destroyed exculpatory evidence, specifically, a photograph of the suspect vehicle taken by a witness.[37]

The State contends that Davenport's petition is untimely.[38]    Alternatively, the State contends that Davenport failed to exhaust his claim of ineffective assistance of appellate counsel for failing to raise on appeal trial counsel's failure to request a mistrial, and that that claim is technically procedurally defaulted.[39]    It argues that Davenport's remaining claims are meritless.[40]    Davenport filed a reply claiming that his fund withdrawal request for postage for his application for post-conviction relief occurred on April 25, 2022, and that is the date that should be used as the filing date.[41]

### Facts

The record facts as succinctly summarized by the Louisiana Fourth Circuit on direct appeal established the following:

> The record shows that Mr. Martin has had multiple encounters with Defendants, which took place both before and after the January 2011 incident. Mr. Martin reported that in 2007—after the murder of his brother—he became a target of violence.    He said the people who killed his brother are related to Mr. Davenport.    According to Mr. Martin, in June 2010, while living in the Pigeon Town neighborhood of New Orleans, while sitting in his truck he saw Jamal Harris ("Mr. Harris") and Mr. Davenport shooting at him.    Again,

---

dated April 25, 2022.

[37]  Rec. Doc. 12; Rec. Doc. 7-2.

[38]  Rec. Doc. 20.

[39]  *Id.,* at pp. 11-12.

[40]  *Id.*, at pp. 13-24.

[41]  Rec. Doc. 25.

in November 2010, while attending a nightclub on Louisiana Avenue with his friend Mr. Bias, he saw Mr. Davenport, Mr. Elmore, Mr. Harris and Mr. Noel. Mr. Harris approached him and a fight ensued.    In January 2011, he was shot and Mr. Bias was killed.    In March, 2012, while walking into a store in the Pigeon Town neighborhood with his friend Jamal Lewis ("Mr. Lewis"), a truck full of individuals connected with the Taliban fired upon them, striking Mr. Lewis.

The testimony elicited at trial is as follows:

According to Mr. Willie Dixon ("Mr. Dixon"), in the early morning hours of January 5, 2011, Mr. Elmore approached him at his home seeking $15.00 he owed to Mr. Elmore for drugs he was given.    He testified that he had previously purchased crack cocaine from local dealers in the Pigeon Town neighborhood, including Mr. Elmore.    After Mr. Dixon told him he did not have the money, Mr. Elmore left, but returned shortly thereafter asking to borrow his car while also brandishing a gun.    To ensure the safety of his family, Mr. Dixon gave him the keys to the silver Explorer he had rented from Enterprise Rental Car ("Enterprise").    Mr. Elmore, after parking the Explorer near the levee at Monticello Street, returned to Mr. Dixon's home around midnight the next morning, gave him the keys to the vehicle and $100 worth of drugs.    Mr. Dixon testified that when he retrieved the vehicle, he noticed the right side rearview mirror was missing.

Mr. Dixon further testified that he was approached by two of the Defendants' associates on two different occasions and told not to testify in court.    According to Mr. Dixon, Tyrone "Googles" Brooks ("Mr. Brooks") approached him, warning him not to testify "if he knew what was best for him."[3]    During another encounter, Bryant Jarrow ("Mr. Jarrow"), an unindicted co-conspirator, gave him drugs in exchange for him not appearing in court. Mr. Dixon further testified that he felt that he was being intimidated and feared for the safety of his family if he testified in court.

[3] In Detective Swalm's testimony, the jury was advised that the State charged Mr. Brooks with public intimidation and racketeering for his threats on Mr. Dixon, for which he plead guilty.

Mr. Martin, the surviving victim, testified that after Mr. Bias picked him up from the Pigeon Town neighborhood, they entered the Carrollton Avenue on-ramp, heading toward New Orleans East.    Shortly thereafter, a silver Explorer followed them onto the interstate.[4]    He testified that gunshots were fired soon after they entered I–10.    After hearing the gunshots, he looked to his left and saw that the gunshots were coming from the Explorer, which was occupied by four individuals, Messieurs Harris, Noel, Elmore and Davenport.

[4] This fact was confirmed by the introduction of red light camera footage by the State, depicting the interstate entrance at Carrollton Avenue.

According to Mr. Martin, Mr. Harris—the driver of the Explorer—pulled along the left side of their vehicle while Mr. Elmore and Mr. Davenport

began shooting out of the window at him and Mr. Bias.    Mr. Bias was killed immediately and Mr. Martin was shot in his legs and back, which required surgery.    Mr. Martin testified that the shooting lasted four to five minutes. Mr. Martin identified the Defendants, and testified that he knew the Defendants from the neighborhood and school.

Dr. Michael Defatta, an expert in forensic pathology, conducted Mr. Bias' autopsy.    He testified that Mr. Bias had nine penetrating body, head and extremity wounds that were inflicted by a weapon thirty-six to forty-three inches from his body.    He also attested that Mr. Bias' cause of death was the result of two fatal wounds to his chest, which perforated his heart and lungs.

Anthony Pardo, a seventeen-year veteran with the NOPD assigned to the homicide and FBI Gang Task Force at the time of the shooting, arrived at the scene of the shooting around 1 p.m.    He testified that he conducted a general investigation of the crime scene and recovered fourteen .40 caliber shell casings from the scene.

Meredith Acosta, a firearms and ballistics identification and testing expert, testified that she examined the ballistic evidence recovered from the scene of the crime.    She opined that the bullet fragments and cartridge cases recovered from the crime scene were from three separate weapons. However, at trial she did not identify the gun used in the shooting.

Detective Chris Harris, assigned to the NOPD/FBI Violent Crime Task Force, was also present at the crime scene.    Detective Harris testified that upon arrival at the crime scene, he did a general investigation of the area and collected evidence.    During his testimony Detective Harris identified the State's exhibits, which included photographs of the crime scene depicting the position of the Mr. Bias' vehicle when it crashed into the guardrail on the interstate, and Mr. Bias' body in the driver's seat of the vehicle, slumped over the steering wheel.

Sergeant Williams[5], the lead investigator who arrived on the scene at approximately 1:15 p.m., testified that her responsibility on the day of the shooting was monitoring the integrity of the crime scene, gathering evidence and assigning NOPD personnel in processing the scene.    She recalled assigning Detectives Pardo and Harris to process the scene of the crime for evidence.

[5] At the time of trial, Regina Williams had been promoted from detective to sergeant. For consistency, we will refer to her as Sergeant Williams.

According to Sergeant Williams, the day after the shooting, she went to Enterprise on Carrollton and Tulane to conduct a search of the Explorer for evidence connected to the shooting.    Although the vehicle had already been

washed and vacuumed, she noticed that the passenger side rearview mirror was broken and there was a smudge mark on the bumper of the vehicle. While at Enterprise, she learned that the vehicle had previously been rented to Mr. Dixon.

Sergeant Williams testified that she spoke with Mr. Dixon who gave a statement wherein he acknowledged that he loaned his vehicle to a person named "Peazy" and also gave her a physical description of him. Sergeant Williams testified that Mr. Dixon identified Mr. Elmore from a six-person photo lineup as the person to whom he loaned his vehicle.

Six days after the I–10 shooting, Sergeant Williams met with Mr. Martin at his home. Sergeant Williams testified that she presented Mr. Martin with several photo lineups. In the first lineup, he identified Mr. Elmore as the shooter sitting in the rear passenger side of the vehicle from where the shots were fired. In the second photo lineup, he identified Mr. Davenport as the shooter sitting in the front passenger side of that vehicle; and in subsequent lineups, he identified the vehicle's other occupants. According to Sergeant Williams, Mr. Martin's identification of the persons involved in the shooting was immediate upon seeing the photo lineups.

Lastly, Sergeant Williams identified associates of the Defendants who were present in the courtroom. She testified that she felt threatened with their presence in the courtroom during her testimony.

Detective Timothy Bender testified that after Mr. Martin identified the persons responsible for the 1–10 shooting, he obtained a search warrant for Mr. Elmore's residence. At the time of the shooting, Mr. Elmore was residing with his girlfriend and her mother on Eagle Street in the Pigeon Town neighborhood. During the initial search, Detective Bender recovered Mr. Elmore's wallet and identification card. However, an intercepted jailhouse phone call between Mr. Elmore and his girlfriend revealed that evidence had been removed from the house prior to the search. After learning this information, Detective Bender returned to the residence and spoke with them. They admitted that they removed evidence from the home and placed it in the backyard. Detective Bender testified that after learning the location of the evidence from one of the women, he recovered a white plastic bag containing a .380 caliber semi-automatic handgun, a gun magazine, bullets and crack cocaine. He identified these items at trial, in addition to photos taken at Mr. Elmore's residence during the subsequent search.

Detective Swalm, a ten year veteran of the NOPD and member of the Multi–Agency Gang Unit ("MAG") with the Bureau of Alcohol, Tobacco, Firearms and Explosives, testified as the State's gang expert. His testimony detailed his gang-related work history, such as his role as the Project Safe Neighborhood Detective for the Second District of the NOPD and his

assignment to MAG at the time of trial.    Detective Swalm had encountered the Taliban as part of his general assignment and narcotic work in the Pigeon Town neighborhood.

Detective Swalm identified Defendants, along with other indicted and unindicted co-conspirators, as members of the Taliban gang.    He testified that the gang members had common tattoos and wore T-shirts bearing the name Taliban.    As part of his investigation, Detective Swalm accessed the Facebook accounts of the Defendants, in addition to the individual accounts of indicted and unindicted co-conspirators, which provided further evidence of each individual's membership in and connection to the Taliban.    According to Detective Swalm, the members produced and appeared in social media videos together and professed association with the Taliban, street violence and weapons.    He also noted that Taliban members rapped about their involvement in this shooting. Detective Swalm testified that unlike other well-known gangs, i.e. 'Bloods, "Crips", etc.," the gangs in New Orleans usually do not have a formal power structure.    Most times, the New Orleans gangs consist of individuals who grew up in the same neighborhood or attended the same school and thus, identify themselves as members of a common gang. However, Detective Swalm did identify Mr. Jarrow—an unindicted co-conspirator—as the Taliban member who was "calling the shots" as opposed to a member who actually went out and did "the dirt."

Detective Swalm testified that residents of the Pigeon Town neighborhood supplied information on the gang members and their activities, as did witnesses to the various criminal acts committed by gang members. Detective Swalm compiled a map of the Pigeon Town area and marked the map with fifty-one incidents in which the Defendants and the indicted and unindicted co-conspirator/members of the Taliban were arrested on firearms and narcotics charges and violent crimes—shootings and homicides.    He testified that members of the Taliban had been arrested together and that the Defendants had been arrested together for a prior, unrelated case.    He identified a member of the Taliban, an unindicted co-conspirator, as a shooter in the 2012 incident involving Mr. Martin.    He also identified Mr. Davenport's Facebook account, wherein Mr. Davenport writes in part, "what you think my pistol in my hand for."    During his testimony, Detective Swalm also identified two other Taliban members who were sitting in the courtroom.

Detective Richard Chambers, assigned to the Cold Case Division of the Homicide Division, was called to testify on behalf of the Defendants. Detective Chambers testified that he visited Mr. Martin the day of the shooting at the hospital before he went into surgery.    His purpose was to check on the victim's status, retrieve evidence and get a short statement of what occurred. He stated that Mr. Martin was frustrated about the day's events, but did give him a brief interview.    The interview included few details about the shooting and ended without Mr. Martin identifying the persons who shot him.

Detective Chambers testified that at no time did Mr. Martin indicate he did not know who shot him.

His girlfriend testified that Mr. Elmore was her boyfriend and that he lived with her and her mother at the time of the shooting.    She also testified that on the day of the shooting, Mr. Elmore left her company for an unspecified period of time; however, she could not pinpoint exactly his departure and return times.    Her testimony also revealed that Mr. Elmore asked her and her mother to provide alibis for him by saying that he was at the Eagle Street home all day on the day of the shooting.

Contrary to Mr. Martin's testimony, Delta Elmore—Mr. Elmore's aunt— and Trenell Woods—Mr. Davenport's mother—both testified that the Defendants attended school in Jefferson Parish, not Orleans Parish.    Ms. Woods testified that Mr. Davenport is an artist/rapper and was a member a rap group called "The Taliban Survival Corporation."

Charles Thibodeaux, a hip-hop magazine publisher, testified on behalf of the Defendants.    According to Mr. Thibodeaux, he knew of the "Taliban Survival Corporation" as an up and coming rap group that performed in different venues around New Orleans and had gained notoriety as a rap group. Mr. Thibodeaux testified that his knowledge of the group came from his routine review of local music acts.    He noted that Taliban won a talent competition at a New Orleans area venue.    On cross examination, however, Mr. Thibodaux admitted he did not know the members of the Taliban or their names.[42]

### Preliminary Review

*A.    Timeliness*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 et seq., governs the filing date for this action because Davenport filed his habeas petition after the AEDPA's effective date.    *Lindh v. Murphy*, 521 U.S. 320, 117 S. Ct. 2059, 138 L.Ed.2d 481 (1997).    The AEDPA generally requires that a petitioner bring his Section 2254 claims within one year of the date on which his underlying criminal judgment becomes

---

[42]    *State v. Davenport*, (La. App. 4 Cir. 10/18/17), 316 So. 3d 888, 896-90; St. Rec., Vol. 8 of 22.

"final."[43]

> With regard to finality, the United States Fifth Circuit Court of Appeals has explained:
>
> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."   28 U.S.C. § 2244(d)(1)(A).   When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.   *Roberts v. Cockrell*, 319 F.3d 690, 693 (5th Cir. 2003).   However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires."   *Id.* at 694; *see also Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).
>
> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review.   *See Foreman*, 383 F.3d at 338–39.   As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal.   *See Causey v. Cain*, 450 F.3d 601, 606 (5th Cir. 2006); *Roberts*, 319 F.3d at 693.

*Butler v. Cain*, 533 F.3d 314, 317 (5th Cir. 2008).

---

[43] Title 28 U.S.C. § 2244(d) provides additional grounds, that do not apply here:

(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.   The limitation period shall run from the latest of—

A. the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B. the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

C. the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

D. the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

The Louisiana Supreme Court denied Davenport's counseled writ application on October 8, 2018.   Davenport's conviction became final 90 days later, on January 7, 2019, when he did not file a writ application to the United States Supreme Court.[44]   *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir.1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), *cert denied*, 529 U.S. 1099 (2000); U.S. Sup.Ct. Rule 13(1).   Therefore, under a literal application of the statute, Davenport had until January 7, 2020, to file his federal habeas corpus petition, which he did not do.   Thus, his application must be dismissed as untimely unless the deadline was extended through tolling.

Regarding the tolling of the statute of limitations, the AEDPA expressly provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."   28 U.S.C. § 2244(d)(2). Here, the state-court record shows that on January 3, 2020, Davenport filed his application for post-conviction relief, thereby tolling the one-year federal limitations period after 361 days.   His applications remained properly filed and pending with the state courts and his time continued to be tolled until April 26, 2022, when the Louisiana Supreme Court denied his application for supervisory writs.   Davenport had four days remaining of the one-year limitations period at this point, or until May 2, 2022, in which to file his federal application.[45]

---

[44]   The final day fell on Sunday, January 6, 2019, causing the final day to fall on the next business day, Monday, January 7, 2019.   Fed. R. Civ. Pro. 6(a)(1)(C) ("... if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.").

[45]   The final day fell on Saturday, April 30, 2022, causing the final day to fall on the next business day, Monday, May 2, 2022.   Fed. R. Civ. P. 6(a)(1)(C).

Davenport's original habeas petition is dated April 25, 2022.[46]    Davenport paid the filing fee on May 13, 2022, at which time the clerk of court filed his petition.    However, the fact that Davenport later paid the filing fee does not alter the application of the federal mailbox rule to his *pro se* petition.    *See Cousin v. Lensing*, 310 F.3d 843, 847 (5th Cir. 2002). Davenport's *pro se* supplemental petition received on May 20, 2022, which raises the same claims as his original petition, is also dated April 25, 2022.[47]

The State contends that Davenport's petition is not timely because the supplemental *pro se* petition was not received by the prison mail system until May 17, 2022.[48]    "The burden is on the *pro se* prisoner to show when his pleading was tendered to prison officials for delivery to the court."    *United States v. Duran*, 934 F. 3d 407, 412 (5th Cir. 2019); *see also Howard v. McKamie*, Civ. Action No. 9:17cv11, 2020 WL 702567, at *1, n.1 (E.D. Tex. Feb. 11, 2020) (same).

In support of his assertion that he gave his petition to the prison to mail on April 25, 2022, Davenport attached as an exhibit a copy of an Offender Funds Withdrawal Request dated April 25, 2022, authorizing prison officials to withdraw the postage necessary to mail his habeas petition.[49]    The form was verified and approved by a prison official on that same date.[50]    Such a form has been found to be sufficient evidence to support the conclusion that

---

[46]  Rec. Doc. 4.    The clerk of court initially docketed Davenport's deficient petition on May 9, 2022. On May 10, 2022, the Clerk's Office sent Davenport a notice of deficiency letter advising that he needed to pay the filing fee, utilize the approved form, provide his address, and sign the form.    Rec. Doc. 3.

[47]  Rec. Doc. 7.

[48]  The State does not address the timeliness of Davenport's original habeas petition received by the Clerk's Office on May 9, 2022.

[49]  Rec. Doc. 7-15.

[50]  *Id.*    The document includes the notations "Ind", "5/13/22" and "l-flat."    There is no indication

the prisoner submitted his pleading for mailing to the prison on the date of the form.    *White v. Cain*, Civ. Action No. 12-2906, 2014 WL 3096108, *4 (E.D. La. July 7, 2014).    While the supplemental petition was not stamped by the prison until May 17, 2022,[51] Davenport is correct that any delay on the part of prison officials in processing his mail cannot be held against him.    *O'Neal v. Cain*, 615 F. App'x 233, 234 (5th Cir. 2015) (per curiam). Accordingly, the Court will afford Davenport the benefit of the doubt in this regard and will treat the instant application, as amended, as having been filed on April 25, 2022.

The Court notes that Davenport's original and supplemental *pro se* habeas petitions did not specifically enumerate a claim of destruction of the evidence.    Rather, that claim was included in his counseled brief filed on June 21, 2022.[52]    Thus, the destruction-of-evidence claim filed by Davenport's counsel on June 21, 2022 is untimely, barring application of the relation back doctrine, as the AEDPA's limitations period required suit to be filed on or before May 2, 2022, and a federal habeas action is not tolled during the pendency of a federal petition.    *See Duncan v. Walker*, 533 U.S. 167, 181-82 (2001).

"An amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading ..."    Fed. R. Civ. P. 15(c)(1)(B).    Claims raised in an amendment to a habeas petition do not automatically relate back merely because they arose out of the same trial and conviction."    *Mayle v. Felix*, 545 U.S. 644, 650 (2005).    Amendments do not relate back if they assert "a new ground for

---

[  ] as to the meaning of these remarks, but they were obviously made after April 25, 2022.

[51]  *See* Rec. Doc. 7, at p. 17.

[52]  Rec. Doc. 7-2.

relief supported by facts that differ and both time and type from those that the original pleading set forth." *Id.* Rather, in order to relate back, the timely claims and the proposed amendments must be "tied to a common core of operative facts." *Id.* at 664. "Newly asserted claims relate back if they are premised on the same or similar allegations as those in the original filing." *United States v. Alaniz*, 5 F.4th 632, 636 (5th Cir. 2021) (citation omitted).

Davenport argues that the destruction-of-evidence claim was raised in claim one of his *pro se* habeas petition which claims ineffective assistance of counsel in failing to interview witnesses.[53] In both his original and supplemental habeas petitions, Davenport refers to "claim one of petitioner's post-conviction application." [54] Claim one of Davenport's application for post-conviction relief includes allegations that Sergeant Williams destroyed a photograph of a vehicle fleeing the scene of the shootings.[55] The destruction-of-evidence claim relates to that same photograph. The Court thus finds that this relates to a common core of facts that do not differ in substantial thrust from his claim one. Thus, the claim relates back to the first claim for relief in his *pro se* habeas petitions filed April 25, 2022.

For these reasons, the Court rejects the State's argument that the petition, as amended, should be dismissed as untimely.

### B. Exhaustion and Procedural Default

A petitioner seeking habeas corpus relief under 28 U.S.C. § 2254 must first exhaust his remedies in the state courts before seeking habeas corpus relief from the federal courts.

---

[53] Rec. Doc. 7-2, p. 4, 14-15.

[54] Rec. Doc. 4-1, at p. 14; Rec. Doc. 7, at p. 5.

[55] Rec. Doc. 7-4, at pp. 4, 12

*See* 28 U.S.C. § 2254(b)(1); *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998) (citing

*Rose v. Lun*dy, 455 U.S. 509, 519–20 (1982)); *Nobles v. Johnson*, 127 F.3d 409, 419 (5th Cir.

1997).    As the United States Supreme Court has explained:

> The exhaustion doctrine is principally designed to protect the state courts' role
> in the enforcement of federal law and prevent disruption of state judicial
> proceedings.    Under our federal system, the federal and state courts are
> equally bound to guard and protect rights secured by the Constitution.
> Because it would be unseemly in our dual system of government for a federal
> district court to upset a state court conviction without an opportunity to the
> state courts to correct a constitutional violation, federal courts apply the
> doctrine of comity, which teaches that one court should defer action on causes
> properly within its jurisdiction until the courts of another sovereignty with
> concurrent powers, and already cognizant of the litigation, have had an
> opportunity to pass upon the matter.

*Rose v. Lundy*, 455 U.S. at 518 (citations, footnote, quotation marks, and brackets omitted).

"To exhaust, a petitioner 'must have fairly presented the substance of his claim to the

state courts.' "    *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001).    That requirement

applies to all levels of review in the state-court system, meaning that a petitioner's federal

claim must have been "fairly presented" to "each appropriate state court (including a state

supreme court with powers of discretionary review)."    *Baldwin v. Reese*, 541 U.S. 27, 29

(2004) (emphasis added).    As the United States Fifth Circuit has explained:

> Fair presentation does not entertain presenting claims "for the first and only
> time in a procedural context in which its merits will not be considered unless
> there are special and important reasons therefor."    *Castille v. Peoples*, 489
> U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989) (quotation marks
> omitted).    The purposes of the exhaustion requirement "would be no less
> frustrated were we to allow federal review to a prisoner who had presented
> his claim to the state court, but in such a manner that the state court could not,
> consistent with its own procedural rules, have entertained it."    *Edwards v.
> Carpenter*, 529 U.S. 446, 453, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000).

*Carty v. Thaler*, 583 F.3d 244, 254 (5th Cir. 2009).

"[S]tate prisoners must give the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary review when that review is part of the State's ordinary appellate review procedures.    *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Thus, in order to exhaust fully, the substance of the federal habeas claim must be fairly presented to the State's highest court.    *See Whitehead v. Johnson*, 157 F.3d at 387 (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)).    In Louisiana, the highest state court is the Supreme Court of Louisiana.    *See* La. Const. art. V, § 5(A).

Here, the State correctly contends that Davenport failed to fairly present his claim of ineffective assistance of appellate counsel for failure to request a mistrial in his counseled writ application to the Louisiana Supreme Court, and the claim is unexhausted.    *See* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—the applicant has exhausted the remedies available in the courts of the State...."); *Spellman v. Cain*, Civ. Action No. 15-824, 2016 WL 2637658, at *3-4 (E.D. La. Feb. 19, 2016), *report and recommendation adopted*, 2016 WL 2594837 (E.D. La. May 5, 2016); *Carty v. Thaler*, 583 F.3d at 253-54 ("When undertaking review, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has properly exhausted those remedies, i.e., whether he has fairly presented his claims to the state courts.").    He therefore has not exhausted his state-court remedies as to that claim as required by federal law.

The State also correctly asserts that because state-court review of the claim is no longer available, the federal claim is barred by the doctrine of procedural default.    Even if a habeas claim may be considered "technically" exhausted because a petitioner may no

longer litigate the claim in state court, the habeas claim may nonetheless be subject to procedural default.     "Procedural default exists where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred."     *Bledsue v. Johnson*, 188 F.3d 250, 254–5 (5th Cir. 1999) (citing *Coleman*, 501 U.S. at 735 n. 1, 111 S.Ct. 2546) (footnote omitted).     Under either scenario, a petitioner is considered to have forfeited his federal habeas claims.     *Id.*

Davenport is no longer able to bring his unexhausted claim in the Louisiana Supreme Court.     He is procedurally barred from doing so under state law because his time for seeking review there has run.     Additionally, any attempt to re-litigate his claims now likely would be dismissed as repetitive under Louisiana Code of Criminal Procedure article 930.4, or as time-barred by the provisions of Louisiana Code of Criminal Procedure article 930.8.[56] When state-court remedies are rendered unavailable by the petitioner's own procedural default, federal courts are normally barred from reviewing those claims.     *See Coleman*, 501 U.S. at 722, 111 S.Ct. 2546.

A federal habeas petitioner may be afforded federal review of a procedurally defaulted claim only if he demonstrates "cause" for his default and "prejudice attributed thereto," or that the federal court's failure to review the defaulted claim will result in a

---

[56] Art. 930.4(D) provides that "[a] successive application may be dismissed if it fails to raise a new or different claim."     Art. 930.4(E) also provides "[a] successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application."     Applications for post-conviction relief must be filed within "two years of the date of the judgment of conviction and sentence has become final under the provisions of Article 914 or 922" unless an exception to the time limitation applies.     La. Code Crim. P. art. 930.8(A).

"fundamental miscarriage of justice." *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997) (citing *Coleman*, 501 U.S. at 731–32); *Amos v. Scott*, 61 F.3d 333, 338–39 (citing *Harris v. Reed*, 489 U.S. 255, 262 (1989) and *Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)).    Here, Davenport has made no effort to establish cause for his failure to pursue the defaulted claims in the Louisiana Supreme Court.    His own ignorance of procedural rules for filing does not suffice as cause.    *See Saahir v. Collins*, 956 F.2d 115, 118 (5th Cir. 1992).    This Court's review of the record does not support a finding that any factor external to the defense prevented him from raising the claim in a procedurally proper manner or that any action or inaction on the part of the State prevented him from doing so.    "The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown."    *Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir. 1997) (citing *Engle*, 456 U.S. at 134 n. 43).

A petitioner may avoid a procedural bar only if a fundamental miscarriage of justice will occur if the merits of his claim are not reviewed.    *Id.* (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).    To establish a fundamental miscarriage of justice, a petitioner must provide this court with evidence that would support a "colorable showing of factual innocence."    *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986); *accord Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Glover*, 128 F.3d at 902.    To satisfy this standard, a petitioner must "make a persuasive showing that he is actually innocent of the charges against him. Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted."    *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001) (citations omitted).    To show factual innocence, the petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a

reasonable doubt as to the defendant's guilt.    *Campos v. Johnson*, 958 F. Supp. 1180, 1195

(W.D. Tex. 1997) (footnote omitted); *see Nobles v. Johnson*, 127 F.3d 409, 423 n. 33 (5th Cir.

1997) (actual-innocence factor requires a showing by clear and convincing evidence that,

"but for constitutional error, no reasonable factfinder would have found the applicant guilty

of the underlying offense.").

> However, the United States Supreme Court has cautioned:

> To be credible, such a claim [of actual innocence] requires petitioner to
> support his allegations of constitutional error with new reliable evidence—
> whether it be exculpatory scientific evidence, trustworthy eyewitness
> accounts, or critical physical evidence—that was not presented at trial.
> Because such evidence is obviously unavailable in the vast majority of cases,
> claims of actual innocence are rarely successful.

*Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).    Here, Davenport

presents no new evidence of innocence, much less any new evidence of the type or caliber

referenced in *Schlup*.    Moreover, ample evidence of his guilt was introduced at trial.

Therefore, he has not established that any miscarriage of justice will result from the

application of the procedural bar.

Finally, although not argued in the memoranda submitted, the Court addresses the

propriety of applying a procedural bar to Davenport's ineffective assistance of appellate

counsel claim in light of the United States Supreme Court's holdings in *Martinez v. Ryan*, 566

U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), and *Trevino v. Thaler*, 569 U.S. 413, 133 S.Ct.

1911, 185 L.Ed.2d 1044 (2013).    In *Martinez*, the Supreme Court held that a procedural bar

imposed by a state court " 'will not bar a federal habeas court from hearing a substantial

claim of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding,

there was no counsel or counsel in that proceeding was ineffective.' "    *Trevino*, 569 U.S. at

417, 133 S.Ct. 1911 (quoting *Martinez*, 566 U.S. at 17, 132 S.Ct. 1309).    Here, Davenport

raised his ineffective assistance of counsel claim in his *pro se* application for post-conviction relief.    The trial court denied relief.    Davenport's counsel did not raise the issue in the writ application to the Louisiana Fourth Circuit or the Louisiana Supreme Court.[57]

For the reasons discussed later in this recommendation, Davenport's unexhausted ineffective assistance of appellate counsel claim is not substantial and is wholly meritless. This Court will dispose of the claim on the merits.    28 U.S.C. § 2254(b)(2).

### Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court, a determination of a factual issue made by a State court shall be presumed to be correct.    The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

---

[57]    *See* State Rec., Vol. 21 of 22, Writ Application, 2022-KP-440, 3/16/22; Writ Application, 21-K-0729, 12/12/21.

United States."     28 U.S.C. § 2254(d)(1).

The " 'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."     *Bell v. Cone*, 535 U.S. 685, 694 (2002).     A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent.     *Williams v. Taylor*, 529 U.S. 362, 405B06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010).     An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular state prisoner's case."     *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one."     *Bell*, 535 U.S. at 694.     A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.     *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").     "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA.     *Harrington v. Richter*, 562 U.S. 86, 102 (2011).     Section 2254(d) preserves authority to issue the writ in cases where there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."     *Id.* (emphasis added); *see also*

*Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The AEDPA's deferential standard of review under Section 2254(d) and *Williams*, 529 U.S. at 362, applies only to claims adjudicated on the merits by the state courts.    28 U.S.C. § 2254(d).    With respect to claims that are not fully adjudicated on the merits in state court, the deferential AEDPA standards of review do not apply.    *Cullen v. Pinholster*, 563 U.S. 170, 185-86 (2011); *Henderson v. Cockrell*, 333 F.3d 592, 597 (5th Cir. 2003).    Instead, the federal courts review those claims under pre-AEDPA de novo standards of review.    *Id.* at 598 (citing *Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying de novo standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits)); *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009).

## Analysis

A. *Ineffective Assistance of Counsel (Claims One, Two, Three & Four)*

In claim one, Davenport asserts that he was denied effective assistance of counsel due to his trial counsel's failure to interview key prosecution and defense witnesses.    In claim two, Davenport asserts that his trial counsel was ineffective for failing to preserve his rights under *Bruton v. United States*, 391 U.S. 123 (1968).    In claim three, Davenport asserts that his trial counsel was ineffective in allowing 911 calls to be played at trial without objection and cross-examination.    In claim four, Davenport claims his trial counsel was ineffective in failing to request a mistrial or a limiting instruction after the trial court permitted the State to introduce inadmissible evidence in the form of Jamal Harris's recorded phone conversation without an opportunity to cross-examine the declarant.

The state district court rejected Davenport's claims that his trial counsel rendered ineffective assistance raised in his application for post-conviction relief.[58]    The Louisiana Fourth Circuit Court of Appeal denied Davenport's related writ application.[59]    The Louisiana Supreme Court denied writs finding "Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)."[60]

### 1.    Ineffective Assistance of Counsel Generally

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel.    Specifically, a petitioner seeking relief must demonstrate both deficient performance by counsel and that the deficient performance prejudiced his defense.    *Strickland*, 466 U.S. at 697.    A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."    *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000).    If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e., deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.    *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.    *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001).

---

[58] State Rec, Vol. 2 of 22, Minute Entry, 10/12/21.

[59] *State v. Davenport*, 2021-K-747 (La. App. 4 Cir. 2/14/22); State Rec., Vol. 20 of 22.

[60] *State v. Davenport*, 2022-KH-00440 (La. 4/26/22), 336 So. 3d 886; State Rec., Vol. 21 of 22.

"Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689; *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009). "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' " *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonableness.

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010). Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice." *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695). In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 694).

"Judicial scrutiny of counsel's performance must be highly deferential," and the petitioner bears a heavy burden in overcoming "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and might be considered sound trial strategy. *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted).

On habeas review, the United States Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to

incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S at 105. The *Harrington* Court went on to recognize the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id*. (citations and quotation marks omitted).

Accordingly, scrutiny of counsel's performance under § 2254(d) is "doubly deferential." *Cullen*, 563 U.S. 190 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009) ). The federal courts must look at counsel's performance under the *Strickland* standard through the "deferential lens of § 2254(d)." *Id*. (citing *Strickland*, 466 U.S. at 689 and quoting *Knowles*, 129 S.Ct. at 1419 n. 2). Furthermore, the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 689–90); *see also Matheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

Because the state courts rejected Davenport's ineffective-assistance of counsel claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state-court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

In fact, the United States Supreme Court has held that, under the AEDPA, federal habeas corpus review of ineffective assistance of counsel claims must be "doubly deferential" in order to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. at 190).

### 2. Failure to Interview and Call Witnesses (Claim One)

Davenport initially claims that trial counsel was ineffective in failing to locate and subpoena two witnesses who observed the shooting and whose testimony would have contradicted the testimony of Corey Martin, the surviving victim.    Davenport also claims that trial counsel failed to interview the motorist who provided Sergeant Williams with a photograph of a vehicle.    He further claims that his counsel failed to investigate Kevin Ward, whose fingerprints were found inside the silver Ford Explorer.

The Louisiana Fourth Circuit found as follows:

> Both relators contend that their respective trial counsels were ineffective in failing to conduct thorough pretrial investigations. Specifically, they contend that witnesses and 911 callers refuted the testimony of Corey Martin that the shooters were driving a Ford Escape of Explorer[4] and instead identified the vehicle as a Ford Bronco.    Elmore also claims that counsel was ineffective in failing to investigate Kevin Ward, whose fingerprints were found in the vehicle involved in the drive-by shooting.
>
>    [4] Davenport contends that the car involved in the shooting was a Ford Escape, while Elmore states that it was a Ford Explorer.    This court's opinion on direct appeal indicates that the vehicle involved in the shootings was a Ford Explorer.
>
> In *Strickland v. Washington*, 466 U.S. 668, 686 (1984), the United States Supreme Court held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result."
>
> > First, the defendant must show that counsel's performance was deficient.    This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment [to the Constitution].    Second, the defendant

must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. "Further, it is unnecessary to address the issues of both counsel's performance and prejudice to the defendant if the defendant makes an inadequate showing on one of the components." *State v. ex rel. Byrd v. State*, 2016-0574, p. 3. (La. 8/14/17), 223 So. 3d 1150, 1151.

With regard to the instant claim of ineffectiveness, the relators fail to show the requisite prejudice. Whether Elmore and Davenport were in a Ford Explorer or Escape or Bronco is relatively insignificant. Although the eyewitness stated that the shots were fired from a Ford Bronco, a Ford Bronco is very similar to a Ford Explorer/Escape. If the relators' purported witnesses had been called to offer testimony that the vehicle at issue was a Ford Bronco, the jury likely would have attributed the slight error, misidentifying an Explorer/Escape for a Bronco as simply that, a slight error. It would not have affected their verdict which was based on Corey Martin's clear eyewitness testimony. As this court previously observed on direct appeal:

> According to Mr. Martin, the shooting last approximately four or five minutes, affording him sufficient opportunity to get a good look at the shooters. Although on the day of the shooting – after being shot and prior to undergoing surgery – Mr. Martin did not identify the shooters to the police, he never denied knowing who shot him; moreover, he immediately and positively identified the Defendant as the shooters six days later when Sergeant Regina Williams presented him with photo lineups.

*Davenport*, 20160223, p. 15, 316 So. 3d at 902 (rejecting Elmore's and Davenport's claims of insufficient evidence).

Similarly, the relators were not prejudiced by their respective counsels' alleged failure to investigate Kevin Ward whole fingerprints were found inside the vehicle used in the drive-by shooting. Such evidence shows that someone else was inside the vehicle, not that the relators were not inside the vehicle, *i.e.*, Ward's fingerprints inside the vehicle do not contradict the eyewitness identification of the relators' as the shooters.[61]

---

[61] *State v. Davenport*, 2021-K-0747, at pp. 3-4 (La. App. 4 Cir. 2/14/22); State Rec. Vol. 20 of 22.

The Louisiana Supreme Court found Davenport failed to meet the *Strickland* standard.[62]

With respect to an attorney's duty to investigate, the controlling law provides:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Newbury v. Stephens*, 756 F.3d 850, 873 (5th Cir. 2014) (quoting *Strickland v. Washington*, 466 U.S. at 690-91). A petitioner cannot show prejudice as to a claim that his counsel failed to investigate without adducing what the investigation would have shown and that the outcome would have been different as a result. *Diaz v. Quarterman*, 239 F. App'x 886, 890 (5th Cir. 2007) (citing *Strickland*, 466 U.S. at 696).

Davenport presents no objective evidence at all to establish that his counsel in fact failed to conduct a proper investigation. Here, the record shows that counsel actively engaged in discovery and that discovery was provided to defense.[63] Counsel's questioning

---

[62] *State v Davenport*, 2022-KH-00440 (La. 4/26/22), 336 So. 3d 886; State Rec., Vol. 21 of 22.

[63] State Rec., Vol. 3 of 22, Minute Entry (noting that State had satisfied its burden under the Discovery Code articles), 10/10/14; State Rec., Vol. 4 of 22, Motion and Order for Production of the Police/Sheriff Incident Report of the Investigation, 8/23/13; Motion for Discovery and Inspection, 8/23/13; Motion for Disclosure of Impeaching Information, 8/23/13; State's Inventory of Discovery Provided to Defense, 9/16/13; State Rec., Vol. 5 of 22, 5 of 22, State's Response to Defendant's Motion for Discovery & Inspection #1, 1/22/14; State's Supplemental Inventory of Discovery Provided to Defense, 1/10/14; State's Corrections to Initial Inventory of Discovery Provided to Defense and Inventory of Supplemental Discovery, 1/22/14; State Rec., Vol. 10 of 22, State's Response to Defendant's Motion and Order for Production of the Police/Sheriff Incident Report of the investigation, 1/22/14; State's List of Supplemental Inventory Provided to Defense, 1/14/15

of the witnesses at trial shows that he was prepared and informed.

Initially, Davenport faults his trial counsel for failing to investigate Kevin Ward, whose fingerprints were found in the Ford Explorer. However, Davenport offers no evidence that his trial counsel did not in fact investigate Ward. Bare speculation does not suffice to meet a petitioner's burden of proof. *See Massey v. Cain*, Civ. Action No. 14-2952, 2016 WL 5376239, at *10 (E.D. La. June 21, 2016), *adopted*, 2016 WL 5362992 (E.D. La. Sept. 26, 2016); *see also Ross v. Estelle*, 694 F. 2d 1008, 1011 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions of a critical use in his *pro se* petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value.") Without evidence proving that counsel failed to investigate Ward, Davenport has not established that counsel's investigation was deficient.

Furthermore, Davenport has not shown that the outcome of the trial would have been different had defense counsel investigated Ward. The jury was well aware that six fingerprints were found in the Ford Explorer.[64] Sergeant Williams testified that none of the prints matched Davenport, his co-defendant Elmore, or the other people Martin identified as being in the vehicle at the time of the shootings.[65] She further testified that a print matched Kevin Ward, but that she did not investigate him.[66]

Davenport claims that his trial counsel was ineffective in failing to interview and call two witnesses who called 911 to rebut the testimony of Corey Martin, as well as the motorist

---

[64] State Rec., Vol. 12 of 22, Trial Transcript, at 236-38, 6/17/15; Rec. Doc. 27, at pp. 75-79.

[65] *Id.*, at p. 237.

[66] *Id.*, at 198, 237-40; Rec. Doc. 27, at pp. 77, 83.

who provided Sergeant Williams with a photograph of the alleged vehicle involved in the

shootings.    With regard to interviewing these witnesses, Davenport has presented nothing

but his self-serving argument to establish that counsel did not contact the prospective

witnesses.[67]    Again, a petitioner's bare speculation that additional investigation would

have resulted in a different outcome at trial is insufficient to prove the prejudice required to

prevail on such a claim.    *See Thomas v. Cain*, Civ. Action No. 09-4425, 2009 WL 4799203, at

*9 (E.D. La. Dec. 9, 2009).

With regard to the failure to subpoena the witnesses to testify at trial, the United

States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas
> review because the presentation of witnesses is generally a matter of trial
> strategy and speculation about what witnesses would have said on the stand
> is too uncertain.    For this reason, we require petitioners making claims of
> ineffective assistance based on counsel's failure to call a witness to
> demonstrate prejudice by naming the witness, demonstrating that the witness
> was available to testify and would have done so, setting out the content of the
> witness's proposed testimony, and showing that the testimony would have
> been favorable to a particular defense.    This requirement applies to both
> uncalled lay and expert witnesses.

*Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets

omitted); *accord Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an

ineffective assistance claim based on counsel's failure to call a witness, the petitioner must

name the witness, demonstrate that the witness was available to testify and would have done

so, set out the content of the witness's proposed testimony, and show that the testimony

---

[67]  The Court recognizes that Davenport's counsel claimed that he did not have the names or numbers
of the 911 callers until a transcript of the 911 calls was turned over to the defense on the first morning
of trial testimony.    *See* State Rec., Vol. 12 of 13, Trial Transcript, at pp. 4-6, 6/17/15.    Nonetheless.
Davenport has presented no evidence that his trial counsel made no effort to investigate and contact
the witnesses during the course of the trial.

would have been favorable to a particular defense.").    For the following reasons, Davenport has failed to establish ineffective assistance for failing to call these witnesses to testify under *Strickland*.

Davenport claims that two people made 911 calls during the shooting and reported that the shooters were in a Ford Bronco.    Davenport claims that these witnesses would have rebutted the testimony that the shooters were in a Ford Explorer.    He also claims that the motorist who provided Sergeant Williams with a photograph of the vehicle fleeing the scene could have given a description of the vehicle and could have testified regarding the quality of the photograph.

Initially, Davenport fails to identify the missing witnesses.    Further, he provides no evidence, such as affidavits from any of the proposed witnesses, demonstrating that they were available and would have testified in a manner beneficial to the defense.    Therefore, Davenport failed to meet his burden of proof with respect to this claim.    *See, e.g.*, *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"); *Buniff v. Cain*, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); *Anthony v. Cain*, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); *Combs v. United States*, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice.");

*Harris v. Director, TDCJ-CID*, No. 06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

Further, Davenport fails to show that he was prejudiced by the failure to call these witnesses to testify.    The 911 calls were played for the jury.[68]    Additionally, Davenport's counsel questioned Sergeant Williams about the fact that some callers had identified the suspect vehicle as a Ford Bronco.[69]    Defense counsel recalled Sergeant Williams to testify in the defense case and questioned her at length about the 911 callers.[70]    Sergeant Williams testified that, according to the 911 transcript, the first 911 caller, when asked to describe the vehicle, said "it looked like a Ford Bronco."[71]    The second 911 caller said the shooters were in a silver Bronco.[72]    Sergeant Williams did not recall whether the two callers placed their 911 calls from the same vehicle.[73]    Defense counsel questioned Williams about differences between a Ford Explorer and a Ford Bronco, and Williams agreed that an SUV from 1996 looked very different from a 2010 model SUV.[74]

On cross-examination, Sergeant Williams testified that Detective Pardo, who responded to the scene, immediately contacted one of the 911 callers, identified as "Chris,"

---

[68]  State Rec., Vol. 12 of 13, Trial Transcript, at p. 70, 6/17/15.

[69]  *Id.*, at p. 209.

[70]  Rec. Doc. 27, at pp. 60, 63-70.

[71]  *Id.*, at pp. 67-68.

[72]  *Id.*, p. at 68.

[73]  *Id.*

[74]  *Id.*, at p. 70.

who told the 911 operator the suspect vehicle looked like a Ford Bronco.[75]    When contacted by Detective Pardo, Chris explained that the suspects who shot at the victims' Camaro were in a silver, newer model SUV.[76]    Sergeant Williams contacted several other 911 callers, two of whom only saw the Camaro hit a guardrail.[77]    The daughter of another caller, Elizabeth Drum, identified the vehicle as a silver SUV with two people in the front and two people in the rear seat.[78]

The uncalled witnesses' proposed testimony would not have definitively supported Davenport's defense that the suspect vehicle was a Ford Bronco.    "Chris" reported to 911 that the suspect vehicle <u>may</u> have been a Ford Bronco.    He, however, told Detective Pardo that the vehicle was a newer model, silver SUV, which testimony would have supported the State's case that the shooters were in a 2010 Ford Explorer.    Drum's proposed testimony that she saw four people in a silver SUV similarly would have supported that State's case. As for the motorist who took a photograph of the alleged suspect vehicle, there is no evidence that she could have testified regarding the make, model or color of it.

Further, any testimony that the suspect vehicle was not a Ford Explorer would have done little to discredit the State's case, which was otherwise strong.    Dixon testified that Elmore borrowed Dixon's "practically brand new" 2010 silver Ford Explorer at sometime between 11:30 a.m. and 1:00 p.m. on the day of the shootings.[79]    Elmore returned the keys

---

[75]    *Id.*, at p. 80.

[76]    *Id.*

[77]    *Id.*, at pp. 80-81.

[78]    *Id.*, at 81.

[79]    State Rec., Vol. 13 of 22, Trial Transcript, at pp. 85, 87, 103-05, 114, 120, 119, 6/18/15.

to Dixon sometime after midnight the following day, but left the vehicle across the levee.[80]
When Dixon found the vehicle, the right passenger mirror was damaged, and the truck had
been cleaned.[81]    Dixon surmised that something bad had happened.[82]    When Dixon asked
Elmore how the Explorer's mirror had been damaged, Elmore told him to keep his mouth
shut and not to go to the police.[83]    Several members of the gang approached Dixon and
advised him not to go to court.[84]    Further, and significantly, Martin identified Elmore and
Davenport as shooting from the vehicle.[85]    Additionally, the jury was able to view, on two
occasions, the red light camera depicting the silver SUV following Bias's Camaro onto the
interstate.

 Davenport has not shown a reasonable probability that, had counsel investigated the
witnesses and Ward, and called the witnesses to testify the outcome of the trial would have
been different.    Having failed to show prejudice, this claim should be denied.

   **3.** <u>Failure to Preserve Petitioner's Rights under *Bruton* and *Douglas* (Claim Two)</u>

 Davenport next claims that his trial counsel was ineffective for failing to object to the
admission of recorded jailhouse calls under *Bruton* and *Douglas v. Alabama*, and for failing
to ask for a limiting instruction before deliberation.

---

[80] *Id.*, at pp. 88, 110.

[81] *Id.*, at pp. 90-91, 110, 112.

[82] *Id.*, at p. 90.

[83] *Id.*, at pp. 118, 121-22.

[84] *Id.*, at pp. 96-98, 128.

[85] *Id.*, at pp. 138-40, 152.

The state district court denied this claim without reasons.     The Louisiana Fourth

Circuit found as follows:

> With regard to the realtors' assertion that their counsel were ineffective for failing to prevent admission of a jailhouse call between Elmore and Jamal Harris (an indicted co-conspirator), contrary to the relators' assertions, review of the trial transcript reflects that both counsel objected strenuously to the admission of the jailhouse call, arguing that it was a violation of the constitutional right to confrontation without an opportunity to cross-examine Harris.[5]   In addition, counsel moved for a mistrial.[6]     Beyond objecting to the admission of the evidence and moving for a mistrial, it is unclear what else counsel could have done to prevent its admission, Moreover, the relators fail to show how they were prejudiced by counsel's alleged ineffectiveness in this regard.     The eyewitness was confident in his identification of the realtors as the shooters and, thus, there is ample evidence to support the relators' convictions for second degree murder and attempted second degree murder conviction.     Similarly, as stated in this court's opinion upholding the realtors' racketeering convictions of direct appeal, there is ample evidence to support these convictions:

>> Our review of the evidence shows the testimony of Detective Swalm established that Messieurs Elmore and Davenport, along with Harris, Noel, Toliver, Jones, Bannister, Brooks, Jarrow and other unindicted co-conspirators were members of a gang called Taliban or P–Block, of which Mr. Jarrow "called the shots."

>> The Taliban members grew up together, primarily in an area called "Pigeon Town," and many of them had been arrested together for previous incidents involving violent crimes, firearms and narcotics charges.     The Taliban members and the unindicted co-conspirators wore common tattoos, T-shirts bearing the name Taliban, produced and appeared in social media videos together and professed association with the Taliban, street violence and weapons.     The evidence further showed that in addition to murdering Mr. Bias on January 5, 2011 and attempting to murder Mr. Martin from June 2010 to March 2012, the Taliban's purpose was the sale of narcotics and public intimidation.     This was corroborated by Mr. Dixon, who testified that before and after the shooting he received drugs from Mr. Davenport, and Mr. Davenport threatened him with a gun.     Mr. Dixon was likewise threatened by Taliban members regarding his testimony at the instant trial.     He feared for the safety of his family.

[5] The district court overruled the objections.
[6] The district court denied the motion for a mistrial because a jailhouse call with an indicted co-conspirator is admissible under Louisiana Code of Evidence.   *See* La. Code Evid. art. 801(D)(3)(b) (a statement is not inadmissible hearsay if offered against a party and the

statement is "by a declarant while participating in a conspiracy to commit a crime...and in furtherance of the objective, provided that a prima facie case of conspiracy is established.").

*Davenport*, 2016-0223, pp. 24-25, 316 So. 3d at 907-908.[86]

The Louisiana Supreme Court found that Davenport failed to meet the *Strickland* standard.[87]

Prior to jailhouse call by Jamal Harris being published to the jury, Davenport's counsel objected on the grounds of hearsay and violation of the right to confrontation.[88]    Elmore's counsel made the same objection, and the trial court overruled them.[89]    When the State offered a transcript of the phone call, counsel for defense again objected.[90]    Davenport's counsel argued that the introduction of Harris's statement violated the defendants' right to confrontation.[91]    Elmore's counsel raised the same objection and further argued that the evidence was inflammatory and irrelevant.[92]    The State argued that Harris's phone call was not testimonial in nature, and, particularly when he referred to the girlfriends of each of the defendants, was evidence of the conspiracy relating to the homicide.[93]    The trial court found that the jailhouse call, which was that of an indicted co-conspirator did not violate the Fifth or Sixth Amendments.[94]    Both defense attorneys moved for a mistrial, which was

---

[86] *State v. Davenport*, 2021-K-747, at pp.5-6 (La. App. 4. Cir. 2/14/22); State Rec., Vo. 20 of 22.

[87] *State v Davenport*, 2022-KH-00440 (La. 4/26/22), 336 So. 3d 886; State Rec., Vol. 21 of 22.

[88] State Rec., Vol. 13 of 22, Trial Transcript, at p. 19, 6/18/15.

[89] *Id.*

[90] *Id.*, at pp. 20-24.

[91] *Id.*, at p. 22.

[92] *Id.*, at pp. 22-23.

[93] *Id.*, at pp. 23-24.

[94] *Id.*, at pp. 24-25.

denied.[95]    The call was then played for the jury.[96]

It is clear from the record that Davenport's counsel objected to the introduction of the evidence on the basis of violation of the right to confront witnesses and also moved for a mistrial.    That counsel was unsuccessful in his efforts does not make him ineffective. *Youngblood v. Maggio*, 696 F.2d 407, 410 (5th Cir.1983) (per curiam).

While Davenport's counsel did not specifically mention *Bruton* or *Douglas* in making his objection or his supporting argument, Davenport has failed to show his counsel was ineffective in failing to do so or any resulting prejudice.

The Sixth Amendment Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."    U.S. Const. amend. VI.    This right includes the opportunity to cross-examine the witness.    *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).    In *Bruton*, the Supreme Court held that where a co-defendant's confession was admitted at a joint trial and the co-defendant-declarant did not take the stand, the defendant was denied his constitutional right of confrontation, even though the jury was instructed not to consider the confession by the co-defendant as evidence against the defendant.    *See* 391 U.S. at 127.

*Bruton* applies only to statements that are incriminating "on [their] face." *Richardson*, 481 U.S. at 208.    Thus, "for a *Bruton* violation to occur, the codefendant's statement must directly implicate the defendant.    Interpreting *Richardson* in the context of *Bruton*, the Fifth Circuit has explained that "[a]dmitting into evidence admissions of a non-

---

[95]    *Id.,* at p. 25.

[96]    *Id.,* at p. 26.

testifying co-defendant that only implicate the defendant when added to other trial evidence is not a *Bruton* violation." *United States v. Dickerson*, 909 F.3d 118, 126 (5th Cir. 2018).

The Supreme Court, however, later created a distinction between testimonial and non-testimonial statements in determining admissibility of out-of-court statements in *Crawford v. Washing*ton, 541 U.S. 36, 53-54 (2004). Only testimonial statements cause the declarant to be a "witness" within the meaning of the Confrontation Clause. *Crawford*, 541 U.S. at 51. Admission of non-testimonial statements is not barred. *Id.* at 59; *see Whorton v. Bockting*, 549 U.S. 406, 412 (2007) (affirming that the Confrontation Clause does not apply to nontestimonial out-of-court statements); *United States v. Delgado*, 401 F.3d 290, 299 (5th Cir. 2005) (holding that *Crawford* is not applicable to nontestimonial hearsay statements).

For a statement to be "testimonial" under *Crawford*, it must have been made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009). Statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 821 (2006). "Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Ohio v. Clark*, 576 U.S. 247, 249 (2015).

Statements about the commission of a crime made to friends or acquaintances in an informal setting are nontestimonial and the admission of such statements does not violate the Confrontation Clause. *United States v. George*, Civ. Action No. 17-201, 2019 WL

4194526, at *6 (E.D. La. Sept. 9, 2019); *State v. Price*, 16–899 (La. 3 Cir. 4/5/17), 216 So.3d 304, 310.    Further, jailhouse calls are non-testimonial and are not subject to *Bruton*. *United States v. Neveaux*, Crim. Action No. 14-20, 2016 WL 6024529, at *2 (E.D. La. Oct. 14, 2016) (citing *United States v. Dale*, 614 F.3d 942, 955–56 (8th Cir. 2010) (finding a co-defendant's inculpatory statements made to a fellow prisoner non-testimonial, and therefore not subject to *Bruton* protection)).

Here, Harris's jailhouse call did not violate *Bruton*.    The statement was made to a third party after Harris was arrested.    There is no evidence that Harris believed that the third party would report the statement to law enforcement.    There is no indication that the purpose of the conversation, let alone the primary purpose, was "to establish or prove past events potentially relevant to later criminal prosecution."    *Davis*, 547 U.S. at 822.

Davenport has failed to establish that the denial of relief by the state courts on this ground was contrary to or an unreasonable application of *Strickland*.    He is not entitled to relief on this claim.

### 4.  Failure to Object to the 911 Calls (Claim Three)

Davenport next claims that his counsel was ineffective in failing to object to the admission of the 911 calls as inadmissible hearsay in violation of *Davis v. Washington*[97] and *Bullcoming v. New Mexico*.[98]

---

[97] In *Davis v. Washington*, 547 U.S. 813 (2006), the United States Supreme Court found that admission of a 911 call did not violate the Confrontation Clause where the caller, who was facing an ongoing emergency and whose answers were frantic, described the events as they were happening, and the nature of the questions and the answers was necessary to resolve the present emergency.

[98] In *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the United States Supreme Court deemed a certified blood-alcohol forensic laboratory report, prepared to assist a police investigation and establish or prove a fact in a criminal proceeding, testimonial in character.

The Louisiana Fourth Circuit did not specifically address this claim.[99]    The Louisiana Supreme Court found that Davenport failed to meet the *Strickland* standard.[100]

Initially, Davenport's claim that his counsel failed to object to the admission of the 911 calls is simply false.    The record reflects that, prior to opening statements, counsel for Davenport objected to the 911 evidence.[101]    The State argued that the 911 calls were made immediately after the shooting, were not testimonial, and were therefore admissible.[102] The trial court found that the calls were nontestimonial and overruled the objection.[103] Davenport's counsel renewed his objection prior to the publishing of the 911 audio and transcripts to the jury.[104]    Counsel for Elmore objected that the transcript had not been authenticated.[105]    The objections were overruled and the recording was played for the jury.[106]

Davenport further claims that his counsel was ineffective for failing to cross-examine witnesses regarding the 911 calls.    The method and scope of cross examination is a type of trial strategy for which counsel is granted reasonable latitude.    *See United States v. Octave*, Crim. Action No. 12-205, 2015 WL 6620117, at *6 (E.D. La. Oct. 30, 2015) (citing *Pape v.*

---

[99]  *See State v. Davenport*, 2021-K-747 (La. App. 4 Cir. 2/14/22); State Rec., Vol. 20 of 22.

[100]  *State v Davenport*, 2022-KH-00440 (La. 4/26/22), 336 So. 3d 886; State Rec., Vol. 21 of 22.

[101]  State Rec., Vol. 12 of 22, Trial Transcript, at pp. 4-6, 6/17/15.

[102]  *Id.*, at 7.

[103]  *Id.*

[104]  *Id.*, at pp. 69-70.

[105]  *Id.*, at p. 70.

[106]  *Id.*

*Thaler*, 645 F.3d 281, 291) (5th Cir. 2011).    The federal courts have made clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment."    *Ford v. Cockrell*, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), *aff'd*, 135 F. App'x 769 (5th Cir. 2005); *accord Lewis v. Cain*, Civ. Action No. 09-2848, 2009 WL 3367055, at *8 (E.D. La. Oct. 16, 2009), *aff'd*, 444 F. App'x 835 (5th Cir. 2011); *Williams v. Cain*, Civ. Action Nos. 06-02224, 06-0344, 2009 WL 1269282, at *11 (E.D. La. May 7, 2009), *aff'd*, 359 F. App'x 462 (5th Cir. 2009); *Parker v. Cain*, 445 F. Supp. 2d 685, 710 (E.D. La. 2006).    The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such matters through the distorting lens of hindsight; rather, courts must employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy.    *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.    It is irrelevant that another attorney might have made other choices or handled such issues differently.    As the Supreme Court noted: "There are countless ways to provide effective assistance in any given case.    Even the best criminal defense attorneys would not defend a particular client in the same way."    *Id.*

In the instant case, Davenport simply has not met his burden with respect to this claim.    A review of the trial transcript shows that defense counsel in fact cross-examined Sergeant Regina Williams about the 911 calls.[107]

It is clear from the record that defense counsel attempted to discredit the State's case through cross-examination in an effort to raise doubt about the reliability of the testimony

---

[107]    State Rec., Vol. 12 of 22, Trial Transcript, at pp. 208-10, 6/17/15.

and in support of Davenport's claim of actual innocence.    The testimony was presented to the jury, which as the trier of fact, weighed and considered the testimony.    The fact that the jury did not believe the defense does not render counsel's performance constitutionally deficient.    *See Martinez v. Dretke*, 99 F. App'x 538, 543 (5th Cir. 2004) ("[A]n unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.").    "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (citations omitted).

Davenport has failed to establish that the denial of relief by the state courts on this ground was contrary to or an unreasonable application of *Strickland*.    He is not entitled to relief on this claim.

### 5.  Failure to Request a Mandatory Mistrial under La. Code Crim. P. art. 770 (Claim Four)

Davenport next claims that his trial counsel was ineffective for failing to move for a mandatory mistrial under La. Code Crim. P. art. 770 after the jury heard Harris's recorded jailhouse calls.

Prior to the State playing the jailhouse calls of co-defendant Jamal Harris for the jury, both defense attorneys objected on the grounds of hearsay and violation of the right to confrontation.[108]    The trial court overruled the objections.[109]    Prior to the admission of Harris's last call, Davenport's counsel again argued that Harris's statement violated the right

---

[108]  State Rec., Vol. 13 of 22, Trial Transcript, at pp. 19-20, 6/18/15.

[109]  *Id.* at p. 19.

to confront witnesses.[110]    Elmore's counsel voiced the same objection and explained that

the defense could not cross-examine Harris, and that the call was highly inflammatory and

irrelevant.[111]    The State argued that the call was not testimonial in nature and was evidence

of the conspiracy.[112]    The trial court found no basis to exclude the jailhouse call of the

indicted co-conspirator.[113]    Both counsel for Elmore and Davenport moved for a mistrial,

which was denied.[114]

Davenport recognizes that his trial counsel moved for a mistrial, but faults him for

failing to specifically move for a mandatory mistrial under La. Code Crim. P. art 770.    La.

Code Crim. P. art. 770 provides:

> Upon motion of a defendant, a mistrial shall be ordered when a remark
> or comment, made within the hearing of the jury by the judge, district
> attorney, or a court official, during the trial or in argument, refers
> directly or indirectly to:
> (1) Race, religion, color or national origin, if the remark or comment is
> not material and relevant and might create prejudice against the
> defendant in the mind of the jury;
> (2) Another crime committed or alleged to have been committed by the
> defendant as to which evidence is not admissible;
> (3) The failure of the defendant to testify in his own defense; or
> (4) The refusal of the judge to direct a verdict.
>
> An admonition to the jury to disregard the remark or comment shall
> not be sufficient to prevent a mistrial.    If the defendant, however,
> requests that only an admonition be given, the court shall admonish the
> jury to disregard the remark or comment but shall not declare a
> mistrial.

---

[110] *Id.* at p. 22.

[111] *Id.* at pp. 22-23.

[112] *Id.* at pp. 23-24.

[113] *Id.* at pp. 24-25.

[114] *Id.* at p. 25.

Generally, article 770 does not apply to state witnesses because they are not "court officials." *State v. Pierce*, 11–KA–320 (La. App. 5 Cir. 12/29/11), 80 So. 3d 1267, 1271.

Davenport has not presented any evidence that a comment falling within the scope of article 770 was made within the hearing of the jury. Because there were no valid grounds to support a motion for a mandatory mistrial under article 770, counsel was not deficient for failing to urge such a motion. Failure to file a frivolous motion or lodge a futile objection does not cause counsel's performance to fall below an objective level of reasonableness. *See United States v. Preston*, 209 F.3d 783, 785 (5th Cir. 2000) (citing *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998)); *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (citing *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) ).

In summary, Davenport has not shown that the state-court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## 6. Ineffective Assistance of Appellate Counsel (Claim Four)

Davenport claims his appellate counsel was ineffective for failing to raise on appeal a claim that a mandatory mistrial should have been granted.

The Louisiana Supreme Court found that Davenport failed to meet the *Strickland* standard.[115]

---

[115] *State v Davenport*, 2022-KH-00440 (La. 4/26/22), 336 So. 3d 886; State Rec., Vol. 21 of 22.

Criminal defendants are entitled to effective assistance of counsel in their first appeal of right. *Evitts v. Lucey*, 469 U.S. 387, 394 (1985). The *Strickland* standard also applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997). In reviewing claims of ineffective assistance of appellate counsel, the Supreme Court has expressly observed that appellate counsel "need not advance every argument, regardless of merit, urged by the [ ] defendant." *Evitts v. Lucey*, 469 U.S. 387, 394 (1985). When alleging ineffective assistance of appellate counsel, the defendant "must show that the neglected claim would have had a reasonable probability of success on appeal." *Duhmel v. Collins*, 955 F.2d 962, 967 (5th Cir. 1992). However, failing to raise every meritorious claim on appeal does not make counsel deficient. *Green v. Johnson*, 116 F.3d 1115, 1125-26 (5th Cir. 1997) (citing *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir. 1989) ). Similarly, failing to raise a frivolous claim "does not cause counsel's performance to fall below an objective level of reasonableness." *Id.* at 1037. Courts give great deference to professional appellate strategy and applaud counsel for "winnowing out weaker arguments on appeal and focusing on one central issue if possible, and at most a few key issues...." *Jones v. Barnes*, 463 U.S. 745 (1983). This is true even where the weaker arguments have merit. *Id.* at 751–52. Instead, the applicable test is whether the omitted issue was "clearly stronger" than the issue[s] actually presented on appeal. *See, e.g.*, *Diaz v. Quarterman*, 228 F. App'x 417, 427 (5th Cir. 2007); *see also Smith v. Robbins*, 528 U.S. 259, 288 (2000).

Davenport's claim of ineffective assistance of appellate counsel for failing to raise on appeal a claim that the trial court should have granted a mandatory mistrial pursuant to La. Code Crim. P. art 770 is not substantial. Notably, while trial counsel moved for a mistrial

on several occasions, he did not move for a mandatory mistrial under article 770    As a result, appellate counsel was not in a position to raise the claim on appeal.    Appellate counsel cannot be considered ineffective "in declining to raise an unreviewable issue." *Givens v. Cockrell*, 265 F.3d 306, 310 (5th Cir. 2001); *accord Weatherspoon v. Cockrell*, Civ. Action No. 10-4500, 2011 WL 4351397, at *34 (E.D. La. July 8, 2011) ("[A]ppellate counsel was precluded from raising this claim because there had been no contemporaneous objection at trial.    Therefore, appellate counsel was not deficient for failing to raise the issue on appeal, and petitioner suffered no prejudice.    Accordingly, petitioner's instant claim fails because he cannot show a reasonable probability that he would have prevailed on appeal if the issue had been raised." (citations omitted)), *report and recommendation adopted*, 2011 WL 4063611 (E.D. La. Sept. 13, 2011); *Arceneaux v. Cain*, Civ. Action No. 06-3964, 2009 WL 917429, at *10 (E.D. La. Mar. 31, 2009) ("Where appellate review of a claim would be barred due to the absence of a contemporaneous objection, appellate counsel is not ineffective for failing to assert the claim."); *Taylor v. Holliday*, Civ. Action No. 06-4118, 2008 WL 5146505, at *8 (E.D. La. Dec. 4, 2008) (petitioner failed to demonstrate ineffective assistance of appellate counsel when issue was not preserved for appeal).

Further, the Court has already determined above that Davenport failed to demonstrate that his trial counsel was ineffective in failing to request a mandatory mistrial under La. Code Crim. P. art. 770.    For the same reasons, Davenport fails to show that a claim that a mandatory mistrial should have been granted was a "clearly stronger" issue than those raised by appellate counsel.    He therefore is not entitled to relief as to this claim.

### B.    Destruction of Evidence (Claim Five)

In his final claim, Davenport asserts that the State destroyed exculpatory evidence.

He specifically claims that Sergeant Williams destroyed a photograph of the SUV fleeing the scene.    He argues that, as a result of the destruction of the evidence, "the jury was robbed of its factfinder function, subverted by the prosecutorial arm of the State."[116]

When Davenport raised this claim before the state district court, he couched it as a *Brady* claim.[117]    The state district court denied Davenport's claims without assigning reasons.[118]    The Louisiana Fourth Circuit Court of Appeals found as follows:

> Finally, Elmore and Davenport both complain that their right to due process was violated by the destruction by Detective Regina Williams of alleged exculpatory evidence.    However, the alleged exculpatory evidence consisted of a blurry photograph taken of the SUV involved in the drive-by shooting.    Detective Williams testified that she did not retain the photograph in her case file because it was so blurry, there was "nothing I could do with it."

> The due process clause of the U.S. constitution "prohibits the destruction, tampering, or alteration of *material* evidence that is relevant to the charged offense, and convictions tainted by the suppression, destruction or alteration of *material* evidence violated a defendant's 14th Amendment right to due process.    *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (emphasis added).    In order to obtain relief based on prosecutorial misconduct, such as the destruction of evidence, "the misconduct must have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168 (1986).

> In this case, the realtors' Brady claims fail because the evidence at issue (a blurry photograph of the SUV involved in the drive-by shooting) is not material.    By Elmore's admission, this evidence at issue was needed to prove "the model of the vehicle utilized in the shooting."    However, as previously noted, whether the SUV was a Ford Explorer or Escape or Bronco is immaterial in this case because an eyewitness clearly identified Elmore and Davenport as the shooters.    As noted in this court's opinion on direct appeal, the record evidence against the relators is strong: the shooting lasted four to five minutes, affording the eyewitness the opportunity to look at the shooters.    Moreover, the eyewitness knew the shooters and identified them immediately upon

---

[116]  Rec. Doc. 7-2, at p. 17.

[117]  Rec. Doc. 7-4, at p. 26; State Rec., Vol. 8 of 22, Supplemental Memorandum in Support of Petitioner's Application for Post-Conviction Relief, 6/2/20.

[118]  State Rec, Vol. 2 of 22, Minute Entry, 10/12/21.

> being presented with photographic lineups.    Thus, even if the discarded
> blurry photograph indicated that the eyewitness was mistaken as to the make
> of the sooters' vehicle, i.e., it was a Ford Bronco rather than a Ford Explorer,
> such evidence is not material and, as such, does not meet the standard of a
> *Brady* violation.[119]

The Louisiana Supreme Court found that Davenport failed to show that the State withheld

material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[120]

      The prosecution is not permitted to suppress, much less destroy, evidence favorable

to the accused.    *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also Arizona v. Youngblood*,

488 U.S. 51, 58 (1988) (duty exists to preserve potentially useful evidence).    When the

State suppresses or fails to disclose material exculpatory evidence, a due process violation

occurs, regardless of a showing of bad faith.    *See United States v. McNealy*, 625 F.3d 858,

868 (5th Cir.2010) (citing *Illinois v. Fisher*, 540 U.S. 544, 547, 124 S.Ct. 1200, 157 L.Ed.2d

1060 (2004)).    To demonstrate a due process violation where the destruction of evidence

is alleged, the defendant must demonstrate that (1) the State destroyed evidence whose

exculpatory value was "apparent before the evidence was destroyed;" and (2) the defendant

was unable to "obtain comparable evidence by other reasonably available means."

*California v. Trombetta*, 467 U.S. 479, 489 (1984).

      Significantly, in order to establish a Fourteenth Amendment due process violation

based on the destruction of evidence where the exculpatory value of the evidence is

undetermined but may be "potentially useful" to the defense, a defendant must show that

law enforcement acted in bad faith in destroying the evidence.    *Arizona v. Youngblood*, 488

---

[119]  *State v. Davenport*, 2021-K-747, at pp. 8-9 (La. App. 4 Cir. 2/14/22); State Rec., Vol. 20 of 22.

[120]  *State v. Davenport*, 2022-KP-00440 (La. 4/26/22), 336 So. 3d 886; State Rec., Vol. 21 of 22.

U.S. at 58 (1988).    In short, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."    *Id.*

The only evidence regarding the potential exculpatory value of the photograph and the failure to preserve the photograph is the sworn trial testimony of Sergeant Williams. Sergeant Williams testified that the photograph was taken by a motorist through the windshield of her vehicle and that it was raining.[121]    Williams further explained that, "[i]t was a picture that you couldn't make out what was on the picture at all."[122]    Sergeant Williams originally claimed that she made the photograph a part of her report.[123]    She explained, however, that she determined that the photograph had no evidentiary value.[124]

When Williams testified as a defense witness, she explained that she was forwarded a photograph taken on a cellphone that depicted what "[c]ould possibly be" the vehicle.[125] She explained, "I looked at the photograph and there was nothing I could do with that particular photograph.    It was so blurred, you couldn't even tell that it was taken out of a window because of all of the rain that was at the time."[126]    While she originally believed that she had the photograph in her case file, she reviewed the file and could not locate it.[127]

---

[121]  State Rec., Vol. 12 of 22, Trial Transcript, at p. 206, 6/17/15.

[122]  *Id.*, at p. 207.

[123]  *Id.*, at pp. *207, 233.*

[124]  *Id.,* at pp. 234-35.

[125]  Rec. Doc. 27, at p. 61.

[126]  *Id.*

[127]  *Id.*

She testified that she must not have put the photograph in the case file because there was nothing she could do with it.[128]

The evidence of record does not establish that the photograph, which may not have even depicted the actual vehicle involved in the shooting, was exculpatory.     At best, Davenport's argument can be interpreted as suggesting that such evidence could have possibly had exculpatory value.     However, there is no evidence that the State failed to preserve the photograph for the purpose of depriving Davenport of exculpatory evidence. Rather, the evidence of record shows that Sergeant Williams did not place the blurry photograph in the case file because she did not think it had any evidentiary value.     At best, Williams's failure to preserve the photograph was negligent.     Mere negligence is inadequate to show bad faith.     *See Youngblood*, 488 U.S. at 58. As a result, Davenport fails to show bad faith on the part of the State.

The state courts' rejection of this claim on appeal was not contrary to or an unreasonable application of clearly established federal law.     Davenport is not entitled to relief as to this claim.

## **RECOMMENDATION**

**IT IS RECOMMENDED** that Tyrone Davenport's application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error,

---

[128] *Id.*

from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc).[129]

New Orleans, Louisiana, this __17th__ day of _____May_____, 2023.

**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[129] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.